## THE "FREE STATE."

1. It is the duty of a steamer to keep out of the way of a sailing vessel when they are approaching in such directions as to involve a risk of collision. The correlative obligation rests upon the sailing vessel to keep her course, and the steamer may be managed upon the assumption that she will do so.

2. Where a sailing vessel, ascending the Detroit River in a direction nearly north, bore two or three points to the west, while an ascending steamer overtook and passed her, to give a wider berth to such steamer, which steamer passed to the east of a descending steamer, — *Held*, 1. That the descending steamer had the right to assume that the sailing vessel would hold her westerly course, and that she was in the right in shaping her course to the east for the purpose of passing the sailing vessel; and that a subsequent change of the course of the sailing vessel to the east when within three hundred feet of the descending steamer was unjustifiable, and that the collision resulting therefrom was solely the fault of the sailing vessel. 2. That there was no fault in the descending steamer in not slackening or stopping until such change of course in the sailing vessel rendered a collision probable.

3. It is not the rule of law, under the sixteenth of the articles enacted by Congress to avoid collisions, when a steam-vessel is approaching another vessel, and where a collision may be produced by a departure of the latter from the rules of navigation, that the former vessel is bound to slacken her speed, or stop and reverse. Each vessel may assume that the other will reasonably perform its duty under the laws of navigation; and if, upon this assumption, there could be no collision, the case under the sixteenth article does not arise. The steamer is not bound to take measures to avoid a collision until some danger of collision is present.

APPEAL from the Circuit Court of the United States for the Eastern District of Michigan.

The facts are stated in the opinion of the court.

*Mr. W. A. Moore* for the appellants, and *Mr. George B. Hibbard* and *Mr. Ashley Pond* for the appellee.

MR. JUSTICE HUNT delivered the opinion of the court.

There is but a single question of fact in issue between the parties; and that is as to the course and conduct of the " Meisel " shortly before the collision.

There is but a single question of law in the case; and that is as to the duty of the propeller under the sixteenth of the articles established by Congress for avoiding collisions of vessels.

The facts, as established by the evidence on both sides, and which cannot justly be disputed, are as follows: About day-break on the morning of July 17, 1870, the weather being fine,

and free from fog, the sailing scow "Meisel" entered the Detroit River on her voyage from Lake Erie to a port on Lake Michigan. The wind was west-south-west, free to the scow; and she sailed in a course generally north, but by the marks upon the land, which were well known to her captain, and plainly visible, rather than by the compass, keeping nearer to the Canadian than the other shore. As she passed the village of Amherstberg, the steamer "Jay Cooke" came out from the dock at that place, and passed the scow on her starboard side, at a distance of twice or three times the length of the steamer. The propeller "Free State" was then approaching on her passage down the river. As the steamers approached each other, the "Jay Cooke" gave one blast of her whistle, which was responded to by the "Free State" by the same signal. This indicated that the steamers would pass each other port to port. After the "Cooke" had passed away from her, the scow ported her helm to get into the wake of the "Cooke." As the propeller approached nearer, a second order to port was given by the master of the scow; and she was sailing under this order when she was struck by the propeller on her port side, near the main rigging. The scow was sunk by the collision, and the wife and child of the master were drowned.

The propeller "Free State" was on her voyage down the lakes from Chicago to Buffalo; was making nine or ten miles an hour when she sighted the "Meisel." The scow showed her green light only as she came in sight of the propeller. As she passed the "Cooke," the propeller "Free State" bore to the Canada shore, intending to leave the scow to windward. As the propeller was thus bearing to port, the scow changed her course to port, as already mentioned. The master of the propeller ordered her helm hard-a-port, and rang the bell to stop and back. It was then too late to avoid a collision.

The point of fact in dispute is this: As the "Cooke" was passing her, as already stated, did the scow put her helm to the starboard, thus changing her direction to the west, and authorizing the propeller to believe that she would continue to hold her course westerly, so that it became the duty of the propeller to pass her on her starboard side?

We are of the opinion that she did, not only on the testimony

of all on board the propeller, but by the testimony of the master and mate of the scow. The evidence of the master shows, that, as she entered the Detroit River, the course of the scow was northerly, the wind being west-south-west, the sails on her starboard side, and within two hundred or three hundred feet of the Canada shore. He says, that, when the "Cooke" passed him, the propeller was three hundred or four hundred feet distant between him and the shore; that, as soon as the "Cooke" had passed, he ordered the man at the wheel to keep her off a little; that she swung right off to the mainland (the Canada side). He told him to steady, and he did so. The "Cooke" had, before this, blown the single whistle; and the captain says he supposed he could follow in her track, and pass the propeller on the port side.

This master does not state distinctly, nor does he deny, the very obvious fact, that, as the "Cooke" began to pass him, he put his helm to the starboard, and bore up into the wind. Such must have been the fact, as he was previously steering as nearly north as might be, in the same course with the "Cooke;" and, after she had passed him, it was necessary to port his helm to bring him again into that line. He was out of the line, and could only have been so by starboarding his helm as the "Cooke" was passing him. The "Cooke" was three hundred or four hundred feet from him; and, as she preserved a safe distance from the shore, the scow was probably about the middle of the channel when the "Cooke" had passed her.

The mate is more explicit. He says, that, as the "Cooke" was coming up under their quarter, the captain gave the order to keep her up a little, so as to give the "Cooke" more room, and that under this order she swung to port between two and three points of the compass, and ran under that order till the "Cooke" had passed them. How long a period of time this was, or what distance of travel it covered, is not stated. The "Cooke" had just come out of the dock at Amherstberg, and probably had not acquired much speed. The scow was a free sailer, as is stated, handled well and easily; and, with all sails drawing, she was under way. As the "Cooke" began to lap her quarter, she bore to the west, and so continued till the "Cooke" had entirely left her. Although we do not know the time or the distance that

they so sailed together, we do know that it was so long and so far : first, that the " Cooke " escaped entirely from her ; and, second, that the propeller deemed her then course to be the course adopted by the scow ; that she would continue upon that course ; and that, to pass her safely, she must shape her own course to the eastward.

Supposing her original direction to have been due north, a variation of three points to the west — as stated by the mate — would have carried the scow to north-west by north three thirty-second parts ($\frac{3}{32}$), or nearly one-tenth of a circle westerly of her former course.

The propeller, assuming that the scow would continue her course of north-west by north, bore to the east, intending to pass between the scow and the Canada shore ; which she could have done easily and safely, had the scow so continued her course. The subsequent order, however, to keep off the scow, frustrated this intention, and produced the collision.

This somewhat tedious statement of the facts of the case determines not only that the scow was in the wrong and the propeller in the right in the particulars we have considered, but will aid materially in settling the point of law which is in dispute between the parties. That question arises upon the sixteenth of the rules enacted by Congress for avoiding collisions. It is in these words : " Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse ; and every steamship shall, when in a fog, go at a moderate speed." 13 Stat. 60, 61.

It is contended that here was risk of collision ; that the propeller did not slacken her speed or stop and reverse in time, and hence that she was also in fault, and the damage should be apportioned. A collision did certainly occur ; but was the situation of the parties such that the principle of this article applied to the propeller ? Does this article contemplate a case where a collision is the result of sheer negligence, and disobedience of well-known rules ? or does it apply to cases, where, supposing the parties intend to perform and do reasonably perform their respective duties, the emergency is such that there is still danger that a collision may occur ? — as if, instead of their being, as

was the fact, but the three vessels — the "Cooke," the "Meisel," and the propeller — within a mile of the scene of action, and with a channel a thousand feet in width, there had been two other sailing vessels alongside of or immediately in the rear of the "Meisel." The "Meisel," as the "Cooke" approached, bore off to the west. If one of the other supposed vessels had borne to the east, and the third had continued a northerly course, the propeller would have been placed in an embarrassing position. If she should bear westerly, she would meet the "Meisel;" if easterly, she would encounter the second vessel; and, if she continued her course without variation, she would be upon the third supposed vessel. It would be the plain duty of the propeller under these circumstances, in compliance with the sixteenth article, to slacken her speed, to stop and reverse if necessary, and wait until time should point out the safe course to be pursued. It would be a case involving risk of collision.

The fifteenth article provides that "if two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship." It has been repeatedly held under this article, that the sailing vessel must hold its course, and rely upon the steamship to avoid a collision. This is not only the right of the sailer, but it is its duty; and the steamer is bound to believe that the sailer will so act, and may manage its own vessel upon that supposition. *The Nichols*, 7 Wall. 656; *The Scotia*, 14 id. 170; *The Potomac*, 8 id. 590.

The scow, after the "Jay Cooke" had reached her, stood up the river upon a course of north-west by north. The steamer was coming down the same stream in a direction nearly south. Observing that the scow was sailing in the direction mentioned, the steamer starboarded her helm, thus bearing to the east of south. On these courses there was no risk of collision with the scow. There was no possibility of collision. The faster and the farther the vessels sailed, the farther apart were they. The vessels adopted the principle of the fifteenth article: the scow selected her course; and the steamer, acquiescing in that selection, took the suitable means to pass her in safety. There was no risk of collision. The sixteenth rule did not come into use; and it was not necessary that the steamer should slacken, stop, or reverse.

Subsequently, and when the vessels were within three hundred feet of each other, and probably within three minutes of time, the scow changed her course, and practically ran under the bows of the steamer. Then there was risk of collision, but not until then. The steamer, in this emergency, did stop and reverse; but the time was too short, and the distance too small, to prevent the catastrophe.

To permit a risk of collision under circumstances like these before us is of itself a fault. There is no evidence that there was another vessel within a mile of the three we have mentioned. The channel was a thousand feet wide; and it was the duty of the steamer to shape her course so as to avoid all risk before the vessels were so near each other that any risk could arise. She would have been greatly in fault if she had permitted the point of slackening or stopping and reversing to arise.

The appellants insist that the rule of law is this: That where a steam-vessel is approaching another vessel, and where a collision might be produced by a departure of the latter from the rules of navigation, the former vessel is bound to slacken her speed, or stop and reverse.

We have examined with care the authorities cited by the appellants; but we find none that sustain this proposition. The rule is otherwise.

If two steamers are meeting each other end on, or nearly so, where there is plenty of sea-room, and at a considerable distance from each other, it is not the duty of either to stop, reverse, or to slacken. The duty of each is to pass on the port side, and the rate of speed is not an element in the case. The risk of collision is not present under such circumstances.

In the case of the "Scotia," above quoted, the court say (14 Wall. 170), "This duty of a steamer to keep out of the way implies a correlative obligation to the ship to keep her course, and to do nothing to mislead. Nor is the steamer called to act except where she is approaching a vessel in such a direction as to involve a risk of collision. She is required to take no precautions when there is no apparent danger. Was the "Scotia," then, in fault? We have already said that she was not bound to take any steps to avoid a collision until danger of a collision

should have been apparent; and we think there was no reason for apprehension until the ship light was seen closing in upon her. It is not the law that a steamer must change her course or must slacken her speed the instant she comes in sight of another vessel, no matter in what direction it may be. *The Earl of Elgin*, L. R. 4 P. C. L.; *The Potomac*, 8 Wall. 590; *Williamson* v. *Barrett*, 13 How. 101.

> *The decree of the Circuit Court was right, and must be affirmed.*