## THE RESCUE.

### (*District Court, W. D. Pennsylvania.* April 16, 1885.)

1. COLLISION — TUG AND TOW — DESCENDING AND ASCENDING BOATS IN NARROW CHANNEL.
    A tow-boat, incumbered with a coal-tow, descending the Ohio river, and passing through a narrow channel, has the right of way, and it is the duty of an ascending boat to remain below the channel until the descending tow has emerged therefrom.

2. SAME — DUTY OF PILOT OF DESCENDING BOAT.
    The pilot of the descending tow-boat was not culpable in not warning the ascending boat against entering the channel, both boats being plainly in sight of each other. Each of two approaching vessels may assume that the other will reasonably perform its duty under the laws of navigation.

In Admiralty.

*Barton & Son,* for libelant.

*Knox & Reed,* for respondents.

ACHESON, J. In the mass of testimony in this case are to be found the contradictions between witnesses as respects both matters of fact and of opinion usual in controversies of this nature. By the preponderance of the proofs, however, the following material facts are established to my satisfaction. On the forenoon of November 30, 1883, the libelant's tow-boat Eugene, having in charge a tow of ordinary size, consisting of two coal-boats and three flats, all loaded with coal, was proceeding down the Ohio river upon a stage of about six feet of water, and passing through what is known as "Glass-house Ripple," a chute which, for a descending tow-boat with such a tow as the Eugene then had, is a narrow channel and one very difficult to navigate. The respondents' tow-boat Rescue, having in tow one flat partly loaded with stone, was then coming up the river. When

the Eugene was about 900 feet above and the Rescue was about 800 feet below the lower end of the wing-dam at the foot of Glass-house ripple, the boats exchanged whistles; the Eugene giving the first signal denoting her choice of the right side, to which the Rescue assented. As the Eugene was nearing the foot of Glass-house ripple, the Rescue, without any abatement of speed, entered it, and continued up stream under a full head of steam, with the wing-dam to her starboard. When about 250 feet above the lower end of the wing-dam the boats met and passed each other in dangerous proximity, the flat of the Rescue barely missing one of the coal-boats of the Eugene, but not actually colliding with it. At this moment, however, the Rescue threw her stern out from the wing-dam and in towards the Eugene, and the wheel of the Rescue was thus brought within perhaps 20 feet of the coal-boat; at any rate so close to it that the swells (which were very heavy,) caused by the revolutions of the wheel overflowed the side of the coal-boat and swamped it, so that it had to be cut loose. It sunk in a few minutes, and, with its cargo, was totally lost.

It cannot be pretended that this disaster was the result of inevitable accident. Undoubtedly fault there was somewhere. What the nature of it was, and which party was culpable, or whether both boats were in fault, are the questions now to be determined.

The space between the north shore and the wing-dam is about 400 feet wide, but by reason of a small bar at the wing-dam, a short distance above its lower end, the navigable coal-boat channel there is somewhat less than 400 feet in width, and, perhaps, does not greatly exceed 300 feet. Now, on this occasion, the Eugene was about in the middle of this channel,—slightly nearer the wing-dam than the north shore,—and was floating down stream, backing, from time to time, to keep straight in the channel. Some of the expert witnesses express the opinion that the Eugene should have been nearer the north shore, and quartering northwardly, or at least that that position was preferable. But, according to the clear weight of the evidence, her position in, and manner of running, the channel was free from fault. Besides, it will not do to hold such craft too rigidly to any particular position when running such a channel as Glass-house ripple. Under the most favorable circumstances a descending coal-tow is, to a certain extent, unmanageable. Floating with the stream, the tow is liable to be controlled largely by the current and cross-currents. And the tow-boat has not complete command of her movements like an unincumbered steamer.

Rule 3 for the government of pilots prescribes:

"When two boats are about to enter a narrow channel at the same time, the ascending boat shall be stopped below such channel until the descending boat shall have passed through it; but should two boats unavoidably meet in such channel, then it shall be the duty of the pilot of the ascending boat to * * * stop the engines or move them so as only to give the boat steerage-way, and the pilot of the descending boat shall cause his boat to be worked slowly until he has passed the ascending boat."

I am of the opinion that this rule was applicable to the circumstances of this case. But, even in the absence of such express regulation, it was a clear dictate of common prudence that the Rescue should remain below the mouth of Glass-house ripple until the Eugene had emerged therefrom. The latter was the descending boat, and had the right of way. She was burdened with a full tow, and hence in a measure was helpless to overcome the set of the current which is towards the wing-dam. All this the pilot of the Rescue knew, or was bound to know; and for him to enter there was to assume an unnecessary hazard, and was altogether indefensible.

It is said, however, that the Eugene was in fault in not warning the Rescue back. But to this I cannot assent. The signal which the Eugene had given merely indicated her choice of sides, and was by no means an invitation to the Rescue to enter this channel. The pilot of the Eugene had enough to do to attend to the proper navigation of his own boat. Moreover, each of two approaching vessels may assume that the other will reasonably perform its duty under the laws of navigation. *The Free State*, 91 U. S. 200. But were it conceded that the rescue was justified in entering Glass-house ripple, still she was highly culpable in not abating her speed. The expert testimony is to the effect that it was very dangerous for her to work on a full head of steam in passing the Eugene, and this is demonstrated by what actually occurred. The respondents, however, insist that the lost boat was not seaworthy for lack of proper splash-boards. But that they were reasonably sufficient is, I think, a fair conclusion from the whole proofs. Moreover, I am convinced by the evidence that no ordinary splash-boards would have prevented the swells caused by the wheel of the Rescue from overflowing the coal-boat.

As to the value of the lost property, there has been no serious controversy. The claim as set out in the bill annexed to the libel seemed to be well made out.

Let a decree be drawn in favor of the libelant for the amount claimed, with costs.