THE WILLIAM J. LIPSETT.

THE JOHN R. PENROSE.

(Circuit Court of Appeals, Third Circuit. January 17, 1899.)

No. 26.

COLLISION—NEGLIGENT NAVIGATION.

The schooner P. weighed anchor to the west of the channel of the Delaware river, and started to turn around, and proceed down stream with the tide, before a strong wind. The schooner L. was sailing in full view down the east side of the channel, with a space of half a mile in width in a straight line between P. and the line on which L. was sailing. P. made a wide circle in turning, and, though L. bore off further to the eastward, the vessels collided. When the collision was imminent, nothing was done by the navigators of P. to avert it, though, if her main peak had been dropped, the collision would probably have been averted. Experienced navigators testified that P. should have been turned in the space of less than a quarter of a mile. *Held*, that the collision was the result of the bad navigation and negligence of the P., and that she could not recover for injuries sustained.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Curtis Tilton, for appellant.
Horace L. Cheyney, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPAT-RICK, District Judge.

ACHESON, Circuit Judge. During the night of February 15, 1894, the schooner John R. Penrose lay at anchor, heading up stream, at a point westward of the ship channel of the Delaware river,—outside the channel, and to the westward of it,—about one mile below Ship John light. She was a three-masted vessel, 138 feet 4 inches in length, and on this occasion was loaded, drawing 15 feet of water. At 9 o'clock on the morning of February 16th the anchor of the Penrose was raised, and she commenced paying off, or turning around, eastwardly, to proceed down the river. The tide was ebbing, and a strong wind was blowing down stream. The mate of the Penrose testified that the strong wind blowing down the river and the ebb tide aided the schooner to pay off quickly. That the wind and tide both favored the movement of the Penrose in wearing around must be accepted as an established fact in the case. There is not a particle of evidence in this record to the contrary. The assumption of the nautical expert, whose judgment as to the conduct of the Penrose the learned district judge took, that the state of the tide did not aid the Penrose in rounding, but tended to hinder her, rests upon a misapprehension of the testimony, and we are compelled by the proofs in the case to reject his opinion as to the management of the Penrose. Three masters of schooners, navigators of large experience, and disinterested witnesses, here testified, without contradiction (unless by the master and mate of the Penrose), that a space of one-quarter of a mile in width would afford the Penrose, in the circumstances in which she was on the occasion, the amplest room to pay off in, and get on her course down the river, if she were handled in accordance with the usual practice of seamen, and properly; and that they would not expect her to occupy so much space as a quarter of a mile. The testimony of these witnesses is full, clear, and convincing. Under all the evidence we are entirely satisfied that on this occasion the Penrose could readily have gone around within six or seven times her own length, if she had been navigated in the usual manner, and with ordinary diligence.

On the morning of this 16th day of February the schooner William J. Lipsett, laden with a cargo of coal, was going down the Delaware, drawing 19 feet 9 inches of water. She was a large four-masted vessel. All her sails were set, and she was making about nine knots an hour. She was steering down the usual channel course on the eastern side of the mid-channel. Her master had charge of her deck. At the time the two schooners sighted each other, the Penrose had not yet weighed anchor. When the Lipsett was about one mile off, up stream, the anchor of the Penrose broke ground, and she began to pay off. At that time the Penrose was at a point not less than half a mile westward of the line upon which the Lipsett was sailing; in other words, the course which the Lipsett was then pursuing gave

the Penrose a clear space of fully one-half mile in width in which to wear around. Instead of paying off, and heading down the river upon a curve within the space of a quarter of a mile from her place of anchorage, which was more than sufficient, and more than usual, the Penrose kept moving eastwardly upon a much larger curve, gradually coming nearer the line upon which the Lipsett was sailing. The Lipsett held her original course until the vessels were within about one-half mile of each other, and then changed her course to eastward a point, and soon afterwards kept off eastwardly another point. Then, after a very short interval, the Lipsett kept off still further eastwardly (indeed, all she could bear without danger from jibing). Nevertheless, before the Penrose had completed her rounding, a slight collision between the vessels occurred, the jib boom of the Penrose fouling with the stern rigging of the Lipsett. The rigging lapped the tip end of the jib boom some feet. This was the extent of the collision. The bowsprit of the Penrose did not touch the Lipsett at all, and the damage to the Penrose would have been trivial had not her bowsprit proved to be rotten and unseaworthy. According to the preponderance of the evidence, the place of the collision was more than half a mile in a direct line eastward of the place where the Penrose had anchored, and considerably eastward of mid-channel. The mate of the Penrose himself testified that the Penrose sailed from a position over to the westward of the channel, and outside of the channel, to a point at least in mid-channel, and perhaps to the eastward of mid-channel.

It is conceded that the Lipsett went as far to eastward as was practicable. She has been condemned for not changing her course to the westward, and going under the stern of the Penrose. In determining whether this condemnation is just, regard must be had to the circumstances existing at the time the Lipsett acted. Now, when the master of the Lipsett, at the distance of a mile above, saw the Penrose in the act of turning around to go down the river, the Lipsett was upon a course which gave the Penrose an unobstructed space not less than half a mile wide in which to make the movement. The situation as then seen was entirely free from risk of collision should the Penrose pay off in the usual and the proper manner. This the master of the Lipsett might well presume the Penrose would do. The Lipsett was plainly seen by the Penrose coming down the river upon the regular channel course. We cannot agree with the district court that the master of the Lipsett "was not justified in supposing the Penrose would turn earlier than she did." He was, we think, entirely justified in assuming that the Penrose would turn around in the usual manner, and within the usual distance. He was not bound to anticipate and take precautions against an unnecessary departure by the Penrose from the ordinary practice of seamen. The Free State, 91 U. S. 200. It is quite certain that, had the Penrose rounded in the usual way and within the ordinary space, by the time the Lipsett had overtaken the Penrose the two vessels would have proceeded down stream upon parallel courses not less than a quarter of a mile apart. This the master of the Lipsett testified is what he expected, and that he gave the Penrose ample room to insure it. The

testimony of the three experienced navigators already referred to fully sustains the judgment of the master of the Lipsett as sound, and his course of action as seamanlike. It is clear to us that, save for the bad navigation of the Penrose, no situation would have arisen involving the contingency of the Lipsett's crossing either the bow or the stern of the Penrose. We are of opinion that the sailing course taken by the Lipsett originally was entirely safe for the Penrose, and that the Lipsett was blameless in pursuing it as she did.

Was the Lipsett culpable in not turning to westward at the time she changed her course to eastward? We think not. The evidence convinces us that the then situation of the vessels with respect to each other was such that a change to the westward would have been very perilous to both. It probably would have resulted in a most serious collision. The master of the Lipsett, we think, exercised a wise judgment in keeping off further to the eastward. This move would have prevented any collision had the Penrose even then been rightly handled; but she was not. The evidence is conclusive that the Penrose would have turned around more quickly if her main peak had been dropped. This her master admits. The dropping of the main peak is a common thing, and the work of a moment. Undoubtedly, this simple expedient would have swung the Penrose around to a position of safety. It was not resorted to. The evidence shows that other measures of protection were available to the Penrose. Yet nothing whatever was done by her navigators to avert collision. The Penrose had no lookout. Her officers and crew were engaged in other duties. Her master admits that he gave no close attention to the Lipsett until a collision was imminent. It is not to be doubted, under the proofs, that after the Lipsett's change of course to eastward there was sufficient space and time to have completed the safe turning around of the Penrose if proper attention had been given to her navigation. It is our judgment that the Lipsett was without fault, and that the collision was due altogether to the bad navigation and negligence of the Penrose. The decree of the district court (86 Fed. 696) is reversed, with costs to the appellant, and the cause is remanded to that court, with direction to enter a decree dismissing the libel, with costs to the schooner Lipsett, the respondent, and her owners.