## THE CITY OF ERIE.

### BROWN.v. CLEVELAND & B. TRANSIT CO.

(District Court, N. D. Ohio, E. D.   January 17, 1914.)

Nos. 2485, 2530.

COLLISION (§ 45*) — STEAM AND SAILING VESSELS — FAILURE TO MAINTAIN LIGHTS.

The steamer City of Erie came into collision with and sank a schooner at night on Lake Erie. The testimony tended to show that the lookout and the pilot in charge of the navigation of the steamer saw only the red light of the schooner somewhat to the starboard of straight ahead and the pilot directed the course of the steamer to starboard to pass under the stern of the schooner which he supposed to be on a crossing course, while it was in fact on a meeting and nearly parallel course. After a little time the red light disappeared, and the engines of the steamer were first stopped and then reversed, but too late to avoid the collision. *Held*, on the evidence that the green light of the schooner was not burning, which fault misled those on the steamer and accounted for the collision, and that in the situation as it appeared the steamer was properly navigated and was not in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. § 45.*]

In Admiralty. Suit for collision by the Pittsburg & Erie Coal Company, owner of the schooner Sir C. T. Van Straubenzie against the steamer City of Erie (the Cleveland & Buffalo Transit Company, claimant), in which Annie Brown, administratrix, was intervening libelant. Decree dismissing both libel and intervening libel.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio, for libelant in Case No. 2485.

Goulder, Holding & Masten, of Cleveland, Ohio, for respondent in Case No. 2485.

George B. Marty, of Cleveland, Ohio, for libelant in Case No. 2530.

Goulder, Day, White & Garry, of Cleveland, Ohio, for respondent in Case. No. 2530.

DAY, District Judge. These causes of action grew out of a collision between the steamer City of Erie and the schooner Sir C. T. Van Straubenzie on the morning of September 27, 1910, in the vicinity of Long Point on Lake Erie, in which collision the schooner was sunk. A libel was first filed by the Pittsburg & Erie Coal Company, as owner

of the schooner, against the City of Erie, in which it is sought to recover for the value of the schooner. In this suit the Cleveland & Buffalo Transit Company, as owner of the steamer, intervened by filing claim and answer. Later Annie Brown, administratrix of the estate of Thomas Brown, who was drowned in the collision, filed a libel in personam against the Cleveland & Buffalo Transit Company, as owner of the steamer, intervened by filing claim and answer. To this libel exceptions were taken by the Cleveland & Buffalo Transit Company.

The steamer City of Erie is a side-wheel passenger boat, 316 feet long and 44 feet beam, engaged in the carriage of passengers and merchandise between Cleveland and Buffalo. The schooner Sir C. T. Van Straubenzie was a three-masted sailing vessel of the schooner type, 127 feet 7 inches long and 26 feet 2 inches beam.

The facts as told by witnesses from the City of Erie are substantially that on September 26th, the night before the collision, the City of Erie left Cleveland at 9 o'clock, which was her schedule time, bound for Buffalo. On leaving Cleveland the wind was from the northeast and it was raining, and as soon as the vessel was outside of the Cleveland breakwater, Edward S. Pickell, the pilot, relieved the captain and took charge of the vessel. From Fairport Point the vessel was put on a course further to the northward than the usual course, on account of the sea, which was running from the northward. At 2:37 a. m. standard time, the morning of September 27th, the vessel passed Long Point; at this time the vessel's course was east by north, half north. The wheelsman was at the wheel in the pilot house, and the lookout was standing his watch up in the eyes of the ship, while the pilot was standing at his station in front of the wheel at the window in the front of the pilot house. Some little time after passing Long Point the regular lookout relieved the regular wheelsman at the wheel while he went below, and an extra watchman, who is kept for the purpose of relieving the regular lookout whenever it becomes necessary, had taken the regular lookout's place in the eyes of the ship, and after this exchange of lookouts a red light was seen about a point and a half on the steamer's starboard bow. The pilot Pickell took his glasses and looked at the light, but could see no other light excepting a red one, and this indicated to him that it was a sailing vessel headed to the northward across the City of Erie's course. An order was given to the wheelsman to port, in order to go under the vessel's stern. The wheelsman ported and the pilot continued watching the red light, and as the bearing of the red light did not change fast enough, the pilot ordered the wheelsman to put his wheel hard aport, and this was done to make the steamer swing faster. When the red light was nearly dead ahead, it was shut out entirely, and the moment it was shut out the pilot signaled to the engine room first to stop and directly afterward signaled to back up. It was noticed that the vessel was slowing down. Shortly afterwards the schooner, which proved to be the Sir C. T. Van Straubenzie, was seen standing across the City of Erie's course, and some one was heard calling on the schooner, "Hard up! hard up!" Shortly after this the two vessels came together at an angle of about five points, the City of Erie's stem striking the schooner on the starboard side at about the main rigging. After the collision the engines

of the City of Erie were stopped, and the schooner very shortly after sank. Lifeboats were lowered in order to try to save the crew of the Sir C. T. Van Straubenzie, and two of the crew were saved. The collision occurred at 3 o'clock central standard time, about 20 minutes after passing Long Point. At the time of the collision, the wind was fresh from the north, northeast, probably 18 or 20 miles an hour.

The only member of the crew of the schooner whose testimony was taken was William T. Garner, one of the seamen of the schooner who were saved. He testified, in substance, that the schooner left Port Colbourne at 11 o'clock p. m., bound for Cleveland; that shortly after leaving Port Colbourne he turned in. When he left the deck the wind was well from the northward, a whole sail breeze; the sails were out to port, and they had the wind three or four points free on the starboard side, and were going seven or eight miles an hour; that he went to sleep and woke up, as he thought, about 4 o'clock eastern time, and he heard the captain talking, and soon thereafter he heard the captain calling, "Hard up! hard up!" and then he heard the captain running aft; that he thought there was something wrong, and while he was getting up he heard the crash of collision, and he ran out onto the deck with Hollis (the other man saved) following him; that when he got on the deck he saw that the steamer was right into them; then the steamer began to pull clear of them, and he could feel the schooner settling; he saw Hollis jump into the main rigging, and he ran and climbed into the forerigging, as the schooner was sinking. He then swam to the surface of the water, and was later rescued. He states that this night he did not know what the course of the schooner was, except the way they lay with the wind, which was from the northward; he also states that while he was climbing up into the forerigging he climbed over the green light, and noticed that it was burning.

The important issue in this case is whether or not the Van Straubenzie's green light was burning or was visible to those on the City of Erie at the time the red light was first sighted, for if the green light was not burning, it is probable that the Van Straubenzie was not on a course to the northward of the City of Erie's course at the time she was sighted. If the green light was not burning it is quite probable that the schooner was either on a course about parallel with the City of Erie's course and a little to starboard of the City of Erie's course, or else was heading slightly toward the City of Erie's starboard bow. If she were on either of these courses and both the green and red lights were burning, they could have been seen on the City of Erie. If the testimony of those aboard the Erie that the red light was shut out entirely shortly before the collision, this fact, accompanied by the fact that the captain of the schooner gave the order "Hard up," could account for the collision taken in connnection with the navigation of the Erie.

Garner's testimony in reference to the green light is partly supported by the lookout on the City of Erie, who says that the colored light which he saw on the schooner some time prior to the collision might have been green or it might have been red.

Rule 19 of the act of February 8, 1895 (28 Stat. 645, c. 64 [U. S. Comp. St. 1901, p. 2891]) provides:

"When a steam vessel and a sailing vessel are proceeding in such direction as to involve risk of collision the steam vessel shall keep out of the way of the sailing vessel."

Rule 20 of the same act provides:

"Where, by any of the rules herein prescribed one of two vessels shall keep out of the way, the other shall keep her course and speed."

If the red light alone was burning, those navigating the City of Erie had the right to assume that a sailing vessel was on a crossing course from starboard to port, and that this sailing vessel would keep its course, and a proper porting on the City of Erie's part would swing the steamer to starboard and go clear of the schooner by going under her stern. The City of Erie did port, and the red light began to draw closely ahead, which would be the case if the schooner was on a crossing course. But Pickell testified the light did not cross the City of Erie's bows very fast, and he then ordered his wheel hard aport, and after that he then ordered the vessel to slacken speed and back.

It was not the duty of the City of Erie to change her course or slacken her speed until the risk of collision was present. The Free State, 91 U. S. 200, 23 L. Ed. 299. In the present case the risk of collision was not present until the pilot of the Erie observed that the red light was entirely shut out. The fact that the red light was shut out would seem to indicate that the schooner was not holding her course, but that she starboarded and swung in the same direction as the City of Erie was swinging. If the green light was not displayed on the schooner, this is a fault which must be accounted for by the schooner, and would raise a prima facie case of fault against her. The Gray Eagle, 9 Wall, 505, 511, 19 L. Ed. 741; The Excelsior, 39 Fed. (C. C.) 393; The City of Washington, 92 U. S. 31, 23 L. Ed. 600; The Frank Moffet, Fed. Cas. No. 5,060.

It is plain from the record that if only the red light was burning on the Van Straubenzie, and the green light was not burning or was not visible, the City of Erie was properly navigated, and was not at fault. The pilot who was in charge of the navigation of the City of Erie testified that he could not see anything else but the red light; that he made an observation with the ship's glasses, and whether he had been in conversation with the wheelsman or not, as is indicated by the record, there is nothing to show but that he was paying attention to the navigation of the steamer at the time he made his observation of the light on the Van Straubenzie.

Eaton, the wheelsman, testifies that he did not see any lights at all on the Van Straubenzie. He, however, did not come on deck until he felt the jar of collision.

The extra lookout, Moran, was not called by the City of Erie. The testimony shows that he left the country shortly after the collision, and returned later on. He testified that he saw a colored light, and was unable to state whether the light was red or green. He also testified that he saw a flashlight.

McAlpine, the wheelsman on the Erie, also testified that he saw only the red light.

Pickell, the pilot, was produced in court, and asked a few questions by the court, and appeared to be a man of intelligence and integrity.

The only man who says that the green light was burning at the time of the collision, and immediately preceding that time, was the seaman, Garner, who rushed on deck about the time of the collision, and undoubtedly sought at once to save his life. It appears that he testified a day or so after this accident before the United States Local Inspectors of Steamboats, and he was asked certain questions, one of which was whether or not he knew whether the lights were burning. His answer was that they were burning when they were making sail.

The captain and steward of the Erie also testified that the morning after the collision Garner stated to them in a conversation that he did not know whether the green light was burning or not. The conversation which Garner had with the captain and steward of the Erie and the manager of the steamship line operating the City of Erie does not appear to have been of such a character as to cast suspicion upon their motives.

The pilot and the wheelsman on the Erie were apparently attentive to their duties. They testified that they could not see this green light. On the other hand, Garner must have been much excited and in peril of his life, and I am forced to the conclusion that this green light was not burning upon the Van Straubenzie.

This being the situation, the pilot, observing the red light with his night glasses, was of the opinion that there was a sailing vessel on a crossing course, and, knowing that under the law it was his duty to keep clear, he ported his wheel to go under this sailing vessel's stern. After that time there was no fault in his navigation of the steamer under his charge. I am of the opinion, therefore, that the City of Erie was, under the circumstances, properly navigated and the schooner Van Straubenzie was at fault in not having the green light burning. Had this green light been burning the collision would not have occurred.

Inasmuch as I have reached this conclusion, the question raised as to the jurisdiction under the claim of Annie Brown, administratrix, becomes a mooted one. If the facts justified its application, this question would be controlled by the doctrine so well announced by Judge Warrington in the case of Thompson Towing & Wrecking Association v. McGregor, 207 Fed. 209, 124 C. C. A. 479.

An order will accordingly be drawn, dismissing the libel and the claim of Annie Brown, administratrix.