THE KUNKLE BROS.

(District Court, N. D. Ohio, E. D. January 16, 1914.)

No. 2469.

1. TOWAGE (§ 15*)—ACTION FOR BREACH OF CONTRACT—BURDEN OF PROOF.

A contract to tow does not impose either an obligation to insure or the liability of a common carrier, but requires only that the service shall be performed with that degree of caution and skill which prudent navigators usually employed in similar cases, and the burden of showing a breach by negligence or unskillful performance to the injury of the tow rests upon the party alleging it.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 30-38; Dec. Dig. § 15.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. TOWAGE (§ 11\*)—INJURY TO TOW—LIABILITY OF·TUG.**
        Where a tug and tow jointly participate in the control and management of the tow, each party is responsible for his own negligence, resulting in injury to the tow.'
        [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.\*]

**3. TOWAGE (§ 11\*)—INJURY TO TOW—LIABILITY OF TUG.**
     · An injury to a steamer by striking against a pierhead while being towed by the stern into the mouth of a river, in a customary manner at night, *held* not due to any fault of the tug, but to the fault and inattention of the mate of the steamer, who was stationed at the stern as a lookout, and who, if he had observed the swing toward the pier and had caused the starting of the engines forward, could readily have stopped the steamer.
        [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.\*]

In Admiralty. Suit by the Cuyahoga Steamship Company, as owner of the steamship Sheldon Parks, against the tug Kunkle Bros. Decree for respondent.

Goulder, Holding & Masten, of Cleveland, Ohio, for libelant.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio, for respondent.

DAY, District Judge. The Sheldon Parks is a bulk freighter 532 feet in length, 56 feet beam. The tug Kunkle Bros. is a harbor tug 70 feet in length and 19 feet beam. The entrance to Lorain harbor is protected by breakwaters; the breakwaters are marked at their outer ends by pierheads, located 500 feet apart, and 1,800 feet outside of the pierheads marking the outer entrance to the river. The entrance to the river is marked by concrete piers, the general direction of which extends northwest and southeast. The piers are parallel and are 300 feet apart.

The Parks arrived off Lorain at about 4:30 p. m. of the day of the accident, and blew for a tug to take her into the harbor. At about 6:30 p. m. the tug was seen coming out. The Parks' engines were started ahead, and the vessel straightened to make the entrance to the breakwater gap. The tug then came alongside of the Parks; the master of the tug then notified the captain of the steamer that the steamer was to load coal at No. 1 car dump, and ordered the Parks to go under the west breakwater and let go her anchor, and that the tug would then take the steamer in stern first, with her anchor down. The Parks went under the breakwater, and when about parallel with the west breakwater, and about 300 feet off of it, let go her anchor. The night was clear; there was no sea; and a light wind was blowing from the west. After the Parks let go her anchor, the stern line was given to the tug from the steamer, in order that the steamer might be towed in stern first to the coal dock. After taking the stern line, the tug pulled the steamer around, until the steamer was in line with the pier, and heading stern first directly into the mouth of the river. Thereupon the tug began pulling directly astern, and the steamer began to back her engines, in answer to a signal from the tug. As soon as the steamer did this, her stern be-

gan to sag to leeward, and the tug pulled her back in line with the piers. A few minutes later, while the steamer was still heading into the mouth of the river, the tug again signaled her to back, and the Parks again reversed, and again her stern sagged to leeward, so that the operation of swinging the steamer back into the line of the river had to be repeated. For a third time the tug endeavored to pull the stern of the steamer in position to go down the river, and this time the steamer, instead of sagging to leeward, as she had done each of the times before, her stern swung to port. The tug then signaled the steamer to stop backing, and at the same time stopped her own headway; then the tug repeated the signal to stop backing and signaled to go ahead and work strong. The steamer answered these signals, but it was then too late, and her rudder struck on the lighthouse foundation at the outer end of the westerly pier.

The libel charges that the tug so negligently performed the towing service that she brought the steamer's stern under the west pierhead, and notwithstanding that the steamer worked full speed ahead, with her helm hard astarboard, the tug failed to keep her in the proper channel, but by and through her inattention, incompetency, and negligent management, the tug caused the steamer to get out of the regular channel and her stern to collide with the pierhead, damaging her stern and breaking her propeller wheel.

The tug contends that the Parks was at fault in that those in charge of her were incompetent, in that she negligently mismanaged her engines, in that she failed to have a proper lookout aft, in that she failed to heed and promptly answer the signals of the tug, in that she failed to properly work her engines in accordance with the signals of the tug, and in that she failed timely to work her engines ahead before striking the pier.

It is apparent from the record that during these various maneuvers the sternway of the steamer was very slow, and also that after the steamer was in position, and during the entire time when there could have been any danger of collision with the west pier, the tug was towing off to eastward at an angle of from 40 to 45 degrees.

The captain of the Parks was familiar with the harbor at Lorain. The method of taking the Parks into port stern first, dragging her bow anchor, was usual and proper. There was no special agreement or instruction which varied or altered the respective duties ordinarily resting upon a single tug and tow jointly participating in the enterprise of towing the steamer into port. This is made plain by the testimony of Capt. Montgomery of the Parks.

The officers of the Parks regulated the number of anchors she was to have down, determined the place at which the anchor was let go, regulated the length of the anchor chain; and, while the tug gave some signals to back or go ahead on the steamer's engine, it was the steamer's officers who regulated the rate of speed at which the engines were worked. The steamer's officers also had complete control of the rudder of the Parks.

[1] An engagement to tow does not impose either an obligation to insure or the liability of common carriers. The burden is always upon

him who alleges the breach of such a contract to show either that there has been no attempt at performance or that there has been negligence or unskillfulness to his injury in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar cases. The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 292; The Webb, 14 Wall. 406, 414, 20 L. Ed. 774; The Burlington, 137 U. S. 386, 391, 11 Sup. Ct. 138, 34 L. Ed. 731; The L. P. Dayton, 120 U. S. 337, 351, 7 Sup. Ct. 568, 30 L. Ed. 669.

[2] It is plain that preceding the accident, and at the time of the accident, the officers and crews of both vessels jointly participated in their control and management. In such a case each party is responsible for his own negligence. If, by the negligence of the tug, the tow is drawn off her course, the tug is responsible. If, by the negligence of the vessel, she sheers out of her course, she is alone liable. It is a case where both participate in the movements of the tow and both are concerned in its direction. The Frank Moffat, Fed. Cas. No. 5,060.

[3] It is significant that the captain of the Parks testified that the tug got the Parks into a position that was all right for making the pier. Neither he nor any member of his crew makes any criticism of the tug's navigation beyond the fact that the collision itself did occur. It is claimed by the crew of the Parks that for an interval of some 20 to 25 minutes the engines of the Parks were not working. That this interval preceded the striking of the Parks against the pier.

As the steamer's stern on the first two attempts had gone to leeward, the tug might properly have desired to get her stern to windward, so as to be able to pull the steamer's stern, in order to get her headed into the harbor.

At the time that the position was reached outside of the west pier, the steamer's stern was still, according to the Parks' witnesses, from 130 to 500 feet from the pier. The sternway of the steamer could only be checked or stopped by the engines of the steamer herself. The tug could only pull astern, or to one side or the other. Her pulling could give the steamer sternway but could not check it. There is no claim, however, that the tug did give the steamer any excessive sternway. It appears that, immediately preceding the collision, the tug was pulling off to starboard at an angle of some 45 degrees, and doing all it could to bring the Parks' stern properly into the harbor entrance. As the stern of the Parks approached the west pier, the second officer of the Parks was stationed aft, in a position where he could at all times see the west pier, the lighthouse on the end of the pier, and accurately judge the distance between the Parks and the pier. Of all the persons concerned in this maneuver he was in the best position to accurately locate the position of the pier and of the course of the steamer as she approached the harbor entrance. It is significant that he was not called upon to testify. Nor is his absence in any manner explained or accounted for, either in the record or the argument of counsel. It is also very plain from the record that this officer, stationed aft on the

Parks, did not maintain a proper lookout. The second mate of the Parks was at fault in failing to see and anticipate the danger and use the means at his disposal to avoid it. The sternway of the steamer was slow, and it would only have taken a few turns of her propeller to have stopped it. The chief engineer of the steamer admits that the Parks' engines were worked ahead only 10 or 15 seconds before the collision, so it matters not whether the steamer promptly obeyed the signal of the tug to go ahead, or whether it did not, in view of the fact of the plain lack of diligence and skill on behalf of the second officer of the Parks.

I am not impressed with the contention that the tug could have done more than she did do to prevent the striking of the Parks. All of the probabilities of the case, coupled with the fact that the second mate was not called upon to testify, indicate that this accident happened by reason of this second mate's inattention to duty.

Accordingly the libel will be dismissed.