### THE IRVING S. OLDS v. THE JOHN M. McKERCHEY.

No. 3993.

District Court, E. D. Michigan, S. D.

Nov. 20, 1946.

McKeehan, Merrick, Arter & Stewart and George William Cottrell, all of Cleveland, Ohio, and Foster & Lott, of Detroit, Mich., for libelant.

Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, and Hill, Hamblen, Essery & Lewis, of Detroit, Mich., for respondent.

KOSCINSKI, District Judge.

This libel and cross-libel were consolidated for trial.

On July 15, 1943 at about 4:49 A. M., just before dawn, a collision occurred on the Canadian side of the Detroit River at a point somewhat below Belle Isle and abreast of Walkerville, Ontario, between the down-bound steamer Irving S. Olds, loaded with a cargo of 18,000 tons of iron ore, and the up-bound, light, steamer John M. McKerchey. Libelant, Pittsburgh Steamship Company, owner and operator of the Olds, claims damages of $8,000; cross-libelant, the Kelley Island Lime & Transport Company, owner and operator of the McKerchey, claims damages of $30,558.03.

The Olds, built in 1942, is a modern lake freighter with turbine drive. Her overall length is 640 feet with a 67-foot beam and a depth of 30 feet. She was bound from Two Harbors, Minnesota, to Conneaut, Ohio.

The McKerchey, built in 1906, is a twin-screw suction dredge, usually described as a "sand sucker." Her overall length is 183 feet, beam 37 feet, and depth 11 feet. She is equipped with two steam engines and two propellers, starboard and port. Back of the pilot house she is equipped with an "A-frame" for sand suction. Her motive power is 7 to 7½ miles per hour. Both the McKerchey and the Olds are of steel construction.

There were two other vessels near the area of the collision; the freighter La Belle, overall length 524 feet, beam 54 feet, depth 30 feet, loaded and down-bound on the Belle Isle side of the river; and the steamer Mead, light, overall length 400 feet, beam 30 feet, depth 23.8 feet, which left the Pine Ridge coal dock on the American side at 4:30 A. M. and was up-bound, heading diagonally across the river and straightening out in the channel to the west of the Belle Isle buoy which is located about half a mile below Belle Isle in shoal water.

The McKerchey left the Wentworth dock on the River Rouge at 3:25 A. M., bound for the pumping grounds off Algonac. Captain Donaldson took the ship out of the River Rouge into the Detroit River, at which point first mate Holladay took charge of the navigation while the captain went below to rest or sleep. When abreast of the Water Works intake on the Canadian side, and 800 feet off the Canadian shore, the McKerchey proceeded at 7½ miles per hour on a steady course up the river in mid-channel.

Shortly before passing signals were sounded the positions and speeds of the four vessels were as follows:

La Belle—down-bound, 300 feet off the Belle Isle shore, at 11 or 11½ miles per hour, aided by a 2½ mile current;

Olds—down-bound, 300 feet off the Canadian shore, at 12 to 12½ miles per hour, also aided by a 2½ mile current, and either passing or just having passed the La Belle at the lower end of Belle Isle;

McKerchey—up-bound, about 800 feet off the Canadian shore, 7½ miles per hour, and 2 points to starboard of the Olds; and

Mead—up-bound, after going diagonally across the river from the dock on American

side and passing west of the buoy off the lower end of Belle Isle and under way at full speed of 11½ miles per hour, in the channel and on the port side of La Belle, overtaking the McKerchey on the McKerchey's port quarter and about 100 to 150 feet astern of her.

At a lateral distance, the McKerchey was about 150 to 250 feet from the Mead; at the same time the Olds was about 2000 feet upstream from the McKerchey, according to the libelant, and about ¾ of a mile, according to cross-libelant. There are no speed restrictions in the upper Detroit River. The navigable channel in which the collision occurred is between 1600 and 1700 feet wide. The weather was clear, with a light wind which did not affect navigation, and the visibility was good.

In this situation, the four vessels exchanged passing signals. As the Mead got under way full speed, straightening up the river, she blew 2 blasts to the McKerchey, indicating a passing on the McKerchey's port side. McKerchey answered with 2 whistles—assenting to such passing. The Mead also exchanged 2 whistles with the Olds, indicating a starboard to starboard passing, and 1 whistle with the La Belle— a port to port passing. McKerchey established a 2-whistle, starboard to starboard, passing with the Olds, and a 1-whistle, port to port, passing with La Belle. While there is some disagreement as to sequence of the passing signals agreed upon by the four vessels, there is no disagreement on the fact that the foregoing signals were made and passings agreed upon in accordance therewith by the four vessels.

Thus the two down-bound vessels, La Belle and Olds, were descending on the opposite sides of the channel, and the two up-bound vessels, Mead and McKerchey, directing their respective up-bound courses well to the center of the channel, between the La Belle and the Olds. From this point on, it appears that with proper navigation and observance of the pilot rules all vessels concerned would have safely passed each other pursuant to the signals previously exchanged.

While all four vessels were thus under way on parallel and opposite courses, the McKerchey swerved to the left to within 100 feet of the Mead, which immediately sounded a danger signal and stopped its main engine. The McKerchey momentarily straightened on her course and then almost immediately took a sudden sheer to the right, at the same time sounding a 1-whistle blast to the Olds. This was only a minute or less before the collision. The Olds, now very close to the Canadian shore, immediately checked to bare steerageway and sounded a danger signal and 2 blasts of her whistle, indicating that she is proceeding in accordance with the previously agreed-upon starboard to starboard passing. the distance between the two vessels was then between 300 and 400 feet. The McKerchey continued in her sheer and again sounded a 1-whistle blast. The Olds again answered with the danger signal and 2-blasts of her whistle. The McKerchey from the time of her sheer backed her starboard engine and went full speed ahead on her port engine—to accelerate her wrongful maneuver intended for passing the Olds port to port, in the mistaken belief that the Olds had "crossed" her previously agreed upon starboard to starboard passing. The McKerchey continued in her sheer until the impact with the Olds at a 45-degree angle. At the time of the collision the Olds was only 30 feet from the Canadian docks and a ferry boat moored there. The Olds received the impact on its starboard bow at about the anchor box; the McKerchey made a half-circle back and again hit the Olds' port quarter at about the Olds' No. 9 hatch. The McKerchey was damaged on her port bow as a result of the first impact and on her port quarter as a result of the second contact. The McKerchey also suffered damage to her pumping equipment.

There is a conflict in the testimony on two vital points: First, the distance between the McKerchey and the Olds when the McKerchey sheared to the right; and, second, which of these two vessels crossed the established passing signals. Captain Murray, master of the Olds, and several other witnesses from the Olds testified that at the time the McKerchey sheered to the right the two vessels were only from 300 to 400 feet apart; on the other hand, the McKerchey's navigator, Holladay, testified that while the Olds was yet 2,000 feet or

better up-stream from the McKerchey and still bearing on the McKerchey's starboard bow he received a danger signal and a 1-blast signal from the Olds, that he then gave his wheelsman orders for a "hard right". He further testified at the trial: "1 noticed at that time a collision—a risk of collision was involved. I immediately threw in the emergency alarm. First, I rang for the captain; then the emergency alarm. I let her come around with a right hard wheel. In order to speed up the swing, I backed her with the starboard engine—with port engine going full ahead. The Olds continued to bear off to the left, still contrary to the 1-blast signal, and we came together in the vicinity of Walkerville. At the moment of the collision, we were nearly down-stream. * * * The Olds was headed downstream." Holladay also stated, in answer to the court's questions, that he saw the collision to be inevitable when the two vessels were 2500 feet apart, although he admitted in the course of his testimony that the two vessels would have passed each other safely.

Mate Holladay's testimony that Olds sounded a 1-whistle blast following the danger signal is contradicted by all other witnesses who heard and observed the signaling between the two ships. Captain Murray of the Olds testified that he sounded the danger signal and 2 blasts of the whistle when the McKerchey began her sheer directed across his course, thereby insisting on the original established passing, and continued on that course, and that he did not sound 1 whistle after the danger signal. His testimony in this respect is supported by first mate Rea W. Starr, who stood watch on the Olds, Claude Polley, Jr., lookout on the Olds, Charles D. O'-Connor wheelsman on the Olds, Albin W. Christianson, oiler and fireman on watch aboard the Olds, captain Alzie Chiconoski of the Mead, August A. Bredefeld, watchman on the Mead.

During the moments preceding the collision, the Olds continued to swing to its left—closer to the Canadian docks—to permit the McKerchey to pass on the Olds' starboard side, as agreed upon.

The weight of the evidence submitted at the trial and the physical facts existing prior to the collision negative the claim of McKerchey's mate, Holladay, that the Olds in the critical moment before the impact blew a danger signal and 1-blast of the whistle. I find, instead, that the Olds sounded a danger signal and 2 whistles immediately following McKerchey's shear, and continued to maintain her course close to the Canadian shore until the moment of the collision. McKerchey's sheer to the right followed the sounding of the danger alarm by the Mead when the McKerchey on the "slow left" came dangerously close to the Mead and, to extricate herself from that position, almost immediately went into a "hard right", followed by backing or reversing her starboard engine and continuing on "full ahead" of her port engine, thereby directing her course across the bow of the Olds so that from her position as an up-bound vessel her course was reversed to a nearby down-stream position after the impact.

In making this finding on the basis of the evidence submitted, I give due consideration to Holladay's testimony that following the exchange of a 2-whistle passing signal between the Olds and McKerchey, the Olds "was bearing off to the right just a short time" and then continued to her left. This was while the two vessels were yet a "good three-quarters of a mile" away from each other, according to Holladay. The reference to the Olds as "bearing off to the right" was due to a slight bend in the course of the river on the Canadian side and should have been, and actually was, well known to Holladay who made 200 trips a year in these waters for several years before the day of the collision. This slight deviation when the Olds was three-quarters of a mile upstream of itself, was not a contributing factor to the collision, since just before McKerchey's sheer the two vessels were on a parallel opposite course to starboard of each other.

No danger signal was sounded by the McKerchey at any time, although Holladay stated he was concerned about the speed and course of the Olds. When the two vessels were 2500 feet apart, as testified by Holladay, he concluded it was too late to sound a danger signal and that a collision was inevitable. He did not slow down, nor

stop, nor reverse his engines, but continued full ahead with his port engine, reversing only his starboard engine, thus accelerating the McKerchey's sheer to the right into the path of the Olds when, by his own admission, the Olds was coming down towards him at a rate of 12 miles an hour, aided by the current of 2½ miles.

Mate Holladay, the McKerchey's navigator, was confused and inattentive to his duties. He not only misunderstood the Olds' signal, when his vessel took a right shear, but the passing signals exchanged between the Mead and La Belle as well, he having testified that he expected the Mead would go up Belle Isle side of the La Belle and that the La Belle would come down between the McKerchey and the Mead. In the end, he admitted that did not notice how the Mead and La Belle passed each other. He admitted that the Mead might have blown a danger signal to him but that he did not hear it.

The collision took place within one minute of McKerchey's sheer to the right. According to Holladay, the Olds was not less than 2000 feet upstream then. The accuracy and reliability of that statement is open to grave doubt, in view of the apparent confusion existing in the mind of this witness with respect to other important events described by him in the crucial moments preceding the collision. Four witnesses of the Olds, including her master, first mate, lookout, and wheelsman, testified the distance to be at the moment of the shear between 300 and 400 feet. Lookout Bredefeld on the Mead judged the distance to be approximately 300 feet. Captain Chiconoski on the Mead stated the distance as 600 feet although he admitted testifying at the Inspector's hearing shortly after the collision that the distance was 2000 feet. Chiconoski's testimony on this point is unreliable. Lookout Bredefeld, on the Mead, testified that the Olds and McKerchey were a little better than a quarter mile apart when they first exchanged passing signals, that the Olds was then quite far over to the Canadian shore and that the McKerchey began her right sheer when she was but 300 feet from the Olds, that thereafter the Olds blew a danger signal and 2 to the McKerchey, that the McKerchey came back with a 1-whistle blast when she suddenly swerved to the right, towards the Canadian shore, that just before the McKerchey's sheer the Mead blew a danger signal to her "as she seemed to be crowding us quite far over", that after the Mead's danger signal to the McKerchey "she (McKerchey) sort of righted herself and proceeded on her course, straight upbound, probably headed to her right, and it was a matter of a short time, in fact it was a matter of not over thirty or forty seconds, that the collision happened. Evidently, he must have put the wheel hard over in order to get as hard around as he did before the Olds hit the McKerchey. She (McKerchey) was heading practically right on the Canadian shore. In fact, she was a little further turned around, with the Olds hitting her. * * * The McKerchey turned around from dead ahead practically across stream." This witness further stated he did not hear the Olds blowing a 1-blast signal, also, that there was an interval between the first and second exchange of signals between the Olds and the McKerchey.

Lookout Bredefeld of the Mead had a clear view of what was happening before his eyes. He was a disinterested witness. His version of the distance between the Olds and the McKerchey at the time of McKerchey's sheer to the right coincides with the testimony of the Olds' witnesses: i.e., that the distance was approximately 300 or 400 feet. On conflicting testimony between the Olds' witnesses and McKerchey's mate, Holladay, I accept the Bredefeld account as more reliable and convincing evidence that the two colliding vessels were approximately from 300 to 400 feet apart at the moment of the McKerchey's sheer to the right, into the path of the Olds, and that the two vessels were in that position from 30 seconds to one minute before the impact.

Holladay's assertion that the Olds blew the McKerchey a 1-blast whistle, contrary to the 2-blast passing signal previously agreed upon, must be rejected as untrustworthy. It stands alone, as against the testimony given by witnesses on the Olds and the Mead, to the effect that the Olds at no time blew a 1-blast of the whistle to the McKerchey. It would be a most unusual

and extraordinary maneuver by an experienced mariner like Captain Murray of the Olds, after having definitely established his course and following that course along the Canadian shore, to suddenly and without any apparent cause, cross his previous signal and attempt a port to port passing, when the two vessels were set on starboard passing, and at such extremely close quarters as 300 to 400 feet from the McKerchey. I must find, instead, by the great weight of evidence, that it was the McKerchey which "crossed" the previously established 2-whistle blast agreement.

It is conceded by Holladay, the navigator, and Cline, the wheelsman of the McKerchey, that, having definitely established passing signals for a starboard to starboard passing, the vessels would have passed one another safely had the McKerchey maintained her course. Thus Holladay's own testimony establishes beyond question grave faults in the navigation of his vessel, inattention to his duties, misunderstanding signals between the Mead and the La Belle, as well as the signal of the Olds following the danger signal by that vessel, all due to his confused mind in the crucial moments before the collision.

It was Holladay's confused state of mind that resulted in his misapprehending the danger signal and 2 blasts sounded by the Olds for a 1-whistle blast, since it must be found by the great weight of evidence that the Olds did not cross the previous starboard to starboard passing, but that he himself crossed the previous starboard to starboard signal by blowing a 1-whistle blast and putting his rudder hard right athwart the course of the Olds, not when the two vessels were 2000 feet or a half mile apart, but when they were from 300 to 400 feet away from each other, thereby lacing the Olds in extreme peril. And even after Holladay's blowing the 1-whistle blast he continued to observe the Olds bearing to her left—toward the Canadian shore—without taking necessary precautions to avoid the impending collision of the two vessels.

Although Holladay testified that it is not unusual for a vessel, having a clear passage, to cross passing signals, without apparent cause, the more credible testimony on this subject was given by Captain Crawford, fleet captain of the Pittsburgh Steamship Company, who served as master of the Great Lakes vessels for over nineteen years, who testified that it was most unusual for a vessel to change or attempt to change a passing agreement after the same has been established, and that in his long experience he has never changed a passing signal. Captain Murray and first mate Starr of the Olds gave similar testimony.

### Discussion.

If Holladay misunderstood the signal of the Olds, it was his duty under Pilot Rule No. 26, 33 U.S.C.A. § 291, to sound a danger signal by several short and rapid blasts of his whistle, not less than four, and reduce his speed to bare steerageway and, if necessary, to stop and reverse. Similar duties are imposed upon him by Marine Inspectors' Rule, 33 C.F.R. 322.2, which provides, in addition, stopping and reversing, until the proper signals are given, answered and understood, or until the vessels shall have passed each other.

This duty, placed upon him by law, he negligently disregarded. If he honestly believed that the Olds had crossed her signal he should have complied with the foregoing rule. Instead, he navigated his vessel on the assumption that the Olds blew him a 1-blast signal—a most improbable maneuver on the part of the Olds under the physical facts then existing.

The same rule enjoins him from accepting a cross signal if he deems it unsafe to accept and assent to such signal. And yet, in the face of not only utter improbability of such signal from the Olds and the obvious impossibility of executing such a maneuver with safety, he recklessly and negligently gave his ship a hard right rudder intending to steer it between the Olds and the Canadian shore, when he saw that the Olds was hugging the Canadian shore and only a short distance up-stream. A cross-signal by the McKerchey to the Olds, under the circumstances, is prohibited by the rules above quoted.

Under Pilot Rule No. 24, 33 U.S.C.A. § 289, and Inspectors' Rule, 33 C.F.R. 322.5, the Olds, as the descending steamer had the right of way and, by proper and timely

signals to the McKerchey, elected to take the side of the channel nearest to the Canadian shore. To this the McKerchey assented. This was before the vessels were within one-half mile of each other. Thus an orderly and safe passing was established between the two vessels. They were on a parallel opposite course. There was an obligation, then, on the part of the McKerchey, as the burdened vessel, to keep out of the way of the Olds, the privileged vessel.

The McKerchey established a passing agreement not only with the Olds but with the Mead as well. She was bound to keep out of the way of both vessels thereafter, and to keep her course and speed under Pilot Rule No. 20, 33 U.S.C.A. § 285, and Inspectors' Rule No. 33 C.F.R. 322.8. This rule was twice violated by the McKerchey: The first time when she veered to the left toward the Mead, resulting in the Mead's sounding a danger signal, and almost immediately thereafter in sheering sharply to her right. Both of these faulty maneuvers were made on orders of the McKerchey's navigator, notwithstanding that he admitted on the witness stand that all four vessels would have passed each other safely had all passed each other in accordance with the previously established signals. The McKerchey unnecessarily crowded the Mead and then almost immediately thereafter directed her course across the course of the Olds when the peril of such a maneuver should have been and was only too obvious, and when, in the words of the McKerchey's navigator, "the collision was inevitable."

It is charged also that the McKerchey's lookout was improperly stationed on the bridge outside the pilot house of the McKerchey and not on the forecastle head where he should have been. It is not clear, however, from the evidence, that the position of the McKerchey's lookout on the bridge rather than in the bow of the ship in any way contributed to the collision.

In that view of the evidence in this case, the McKerchey was guilty of gross faults. There is neither a logical explanation nor any justification for this unseamanlike maneuver of the McKerchey. The City of Macon, 3 Cir., 92 F. 207; The Suffern,

2 Cir., 232 F. 712; The Yomachichi, 4 Cir., 74 F.2d 977, 103 A.L.R. 768.

Under the so-called Pennsylvania Rule, The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, the burden rests upon the ship guilty of a violation of a statutory rule of showing not merely that her fault might not have been one of the causes of a collision, or that it probably was not, but that it could not have been. Many cases are cited in libelant's brief in support of this rule. The faults of the McKerchey in causing this collision are so glaring that no useful purpose will be served in a further discussion of the rule. McKerchey, as the burdened vessel, collided with the Olds as the privileged vessel. A presumption immediately arises that the McKerchey was at fault and will be so held unless it is shown by clear and convincing proof that the accident was unavoidable or that it was due to the negligence of the privileged vessel. In the absence of such proof the burdened vessel will not be relieved of liability. The McKerchey has not sustained its burden of proof in this respect.

Counsel for both parties have also fully discussed the so-called New York Rule, as stated by the U. S. Supreme Court in the case of City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

Cross libelant vigorously argues that the Olds was guilty of a plain fault by failing to take the ordinary precautions, under the circumstances, in avoiding a collision with the McKerchey. Specifically, it is charged that the Olds, in a narrow channel, with four vessels converging upon each other, continued at an excessive rate of speed of approximately 17 miles per hour; that the Olds should have slackened its speed to

bare steerageway or stopped altogether, and reversed its main engine while it yet had the time to do so. But, I do not accept mate Holladay's testimony as credible, to the effect that the Olds was approximately 2500 feet or one-half mile up-stream from the McKerchey when the McKerchey took a hard right sheer. On the contrary, the weight of the evidence establishes that distance at from 300 to 400 feet. The channel was wide enough for all four vessels to have passed abreast of each other. Starboard to starboard passing was established between the Olds and the McKerchey. No sufficient reason appears why the vessels could not have passed each other without colliding. Mate Holladay was mistaken in his belief that the Olds had signaled a change of its course from a starboard passing to a port passing of the two vessels.

This rule is also referred to in cross libelant's brief as the major and minor fault rule and is discussed at length in the case of General Sea Foods Corporation v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117, 119. In that case the court said: "Even though the first vessel is grossly at fault, a plain fault on the part of the other vessel is not excused."

However, the facts in that case differ from the situation existing between the Olds and the McKerchey. In the General Sea Foods case there was no agreement by both vessels as to passing signals. Here there was such an agreement and the dangerous situation did not arise until the Olds and the McKerchey were at a distance of from 300 to 400 feet of each other, less than one length of the Olds, when the Olds immediately sounded a danger signal upon observing the McKerchey's sheer to the right, and did what good seamanship required of a vessel thrown in extremis by a sudden and unexpected departure from the agreed-upon passing.

■ Up to that moment the McKerchey was in a position of safety on a steady course, with plenty of water between it and the Olds to make a safe passing. No danger was apparent or inherent in this situation until the McKerchey created the perilous condition resulting in the collision becoming inevitable. Mate Holladay of the McKerchey said the collision was inevitable

when he ordered a hard right rudder. If it was inevitable in the mind of Holladay, it follows that the Olds' claims, that she was put in extremis, must be upheld. The Olds had a right to rely on the McKerchey's observance of the agreed passing signals. As was said in the case of Lake Erie Transportation Co. v. Gilchrist Transportation Co., 6 Cir., 1906, 142 F. 89, 95: "Each of these vessels was entitled to presume that the other would act lawfully; would keep to her own side; if temporarily crowded out of her course, would return to it as soon as possible; and that she would pursue the customary track of vessels in the channel, regulating her action so as to avoid danger. The Servia, 149 U. S. 144, 13 S.Ct. 817, 37 L.Ed. 631; The City of New York, 147 U. S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218."

Captain Murray, master of the Olds, testified, and he is supported by other witnesses, that the collision followed within less than a minute of the McKerchey's sheer. He immediately checked to steerageway and blew a danger signal to the McKerchey, followed by 2 whistles, and this signal, while the Olds was in extremis, was repeated, but the McKerchey persisted in answering with a 1-blast of the whistle, while Captain Murray kept his wheel hard left—ward the Canadian bank—until he was close to the docks near a ferry boat. Immediately after the impact he put his wheel hard right and his engine full speed ahead in order to get away from the Canadian docks, and the Olds missed the ferry boat by 20 to 30 feet. He further stated that his change to "slow" would take effect instantly because the type of engine on the Olds would be in reverse the moment he checked—that it would take about four or five seconds to make this operation in the reduction gear turbine. He did not put the engine in reverse "because, with the current on my quarter port, I would have come into the cement dock and possibly would have endangered the lives of my crew who were asleep in the port quarters."

■ The argument is made on behalf of cross-libelant that Captain Murray did not act as a prudent and cautious and skillful navigator in this dangerous situation and

that he was therefore guilty of a plain fault, thereby contributing to the collision. But, in its appraisal of a similar situation in the case of The Ohio, 6 Cir., 1898, 91 F. 547, 558, the court said: "The rule is well settled that when one vessel by her own wrongful maneuver places another in a situation of immediate peril, and the latter does not act with that promptness and accuracy * * * when there was complete presence of mind, and happens to delay or do something, which turns out to have been a mistake, she will not thereby become such a contributor to the mischief as to render her liable for damages. * * * We think this was the situation of the Ohio, and that the failure of her master to instantly reverse, or his failure to reverse when he ported and checked, is not such a fault as to justify her condemnation. For this reason we must disagree with the district court, and reverse so much of the judgment as held the Ohio liable to contribute to the damages."

If the Olds had reversed her engines, there was the possibility of her stern colliding with the Canadian docks or ferry boat anchored there, and, considering the extremely short distance separating the Olds and the McKerchey at that moment, no assumption may be indulged in that a collision of the two vessels would not have occurred notwithstanding the Olds' failure to reverse her engines. In a comparable situation, as disclosed in the case of In re Rend, D.C.D.Minn., Fifth Div. 1903, 126 F. 564, 568, the court said: "If he had reduced speed, or stopped and backed, a collision would have been equally as certain. A collision was imminent, and his vessel was in extremis, and there was nothing left for him to do but to keep on at full speed under his hard aport helm. It is, of course, much easier, after an event has happened, and in contemplation of it, to know what might have been done to avoid it than it would have been at the time."

This case was cited with approval in Pocahantas Steamship Co. v. Steamship Vacuum, D.C.S.D., N.Y., 1913, 49 F.Supp. 439, 442, affirmed per curiam by the Circuit Court of Appeals, 2 Cir., 139 F.2d 348. The District Court there said: "They were not confronted with any special circumstance or danger so long as each held its course. Cf. The Atlantic City, 3 Cir., 143 F. 451. * * * She was confronted with a sudden critical situation, and if those in charge of her navigation committed an error, it was only some thirty seconds before the collision, and was a situation in extremis * * *. In any event, the fault of the Vacuum in going 'hard right' without warning across the Bylayl's course is amply sufficient to account for the collision without speculating whether the Bylayl might have done anything more than she did when faced with the sudden peril."

It is charged by the cross-libelant that in passing the La Belle the speed of the Olds was 17 miles per hour and that this was excessive under the circumstances. There is no direct testimony on this point. Mate Holladay of the McKerchey testified the speed of the Olds to be 12 miles per hour. It has not been definitely established that a current of 2½ miles per hour adds that much to the speed of a vessel. One of the Olds' crew, assistant engineer Hasler, testified that the Olds was not going over 15 miles per hour. Under all the testimony in the case, this seems to be the approximate speed of the Olds before her slow down within a minute preceding the collision. As stated before, there are no speed restrictions in this part of the river and there was no reason to check that speed in view of the established passing signals in waters where all four vessels could have cleared each other had each followed a steady course. There was no reason for apprehending any danger on the part of Captain Murray until thrown into the agony of collision by the gross negligence of mate Holladay, piloting the McKerchey.

In the case of The Fred B. Dalzell, Jr., 2 Cir., 45 F.2d 580, 581, the court, in discussing a similar situation as appears here, where the question of the speed of one vessel was involved, said: "While the Dalzell tug was bound to act prudently, which, of course, includes both the kind and time of action, to avoid collision, even though the Moran was at fault, she had the right to believe that the Moran would comply with the rule and to act accordingly in keeping her own course and speed until she had notice that the Moran was trying to

go ahead of her. When she knew that, we think the record shows that she did the best she could to stop. Some suggestion has been made that, had her speed been less, she would have had time to stop, even after the Moran signaled, and allow her to clear. This·is doubtless so. But she was certainly under no duty to so regulate her speed that she could stop in safety for the Moran to pass ahead whenever and however late that burdened vessel saw fit to notify her that she was about to risk collision in so doing in violation of the starboard hand rule. See The Chicago, [2 Cir.,] 125 F. 712, 716. * * * In the absence of clear proof that the privileged vessel, then acting in extremis, was at fault in failing to avert the collision in spite of the conduct of the wrongdoer, we think the vessel which took the chance, violated the rule, and created the danger, is wholly responsible for the result. Compare The Lexington, [2 Cir.,] 275 F. 279; The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed 943; The Gulf of Mexico, [2 Cir.,] 281 F. 77; The Cranford, [2 Cir.,] 27 F.2d, 710".

And in the case of The Free State, 91 U.S. 200, 23 L.Ed. 299, the court thus stated the law: "It is not the law that a steamer must change her course or must slacken her speed the instant she comes in sight of another vessel, no matter in what direction it may be."

I therefore find on the basis of the evidence that the McKerchey has not discharged its burden under the New York rule, and that the Olds cannot be charged with any fault contributing to the collision.

■ The following conclusions of law are made on the basis of the findings of fact herein made:

The Olds as the descending steamer had the right of way and was the privileged vessel. Pilot Rule 24, 33 U.S.C.A. § 289. Pursuant to Pilot Rule 24, 33 U.S.C.A. § 289, the Olds established a starboard to starboard passing with the McKerchey, which the McKerchey negligently failed to observe by a sudden and unexpected sheer into the path of the Olds, placing the Olds in extremis and resulting in a collision becoming inevitable.

The McKerchey is guilty of violating Pilot Rule 20, 33 U.S.C.A. § 285, and Inspectors' Rule No. 33 C.F.R. 322.8, in that she, after entering into an overtaking agreement with the Mead, failed to hold her course and altered her course to the left toward the course of the Mead, creating a dangerous situation, causing the Mead to sound her a danger signal, leading to the sudden and unexpected sheer which independently of any other cause resulted in the collision.

The Olds had a right to rely on the McKerchey keeping her course. There were no unusual conditions or circumstances which would put the Olds on notice that the McKerchey would not observe the established passing signals until, through the fault of the McKerchey, the collision became unavoidable. Until that moment there was no risk of collision.

The McKerchey was guilty of the violation of Pilot Rule 26, 33 U.S.C.A. § 291, and Inspectors' Rule 33 C.F.R. 322.3, which prohibits the sounding of a cross signal, and the McKerchey also failed under that rule to sound a danger signal and reduce her speed to bare steerageway, and, if necessary, to stop and reverse. Had the McKerchey complied with this rule, the collision need not have occurred. Good seamanship placed the duty upon him to avoid a collision, and not to deliberately steer his vessel into one when the physical facts then existing should have been a warning that he could not negotiate a crossed signal passing, even though he honestly thought that the Olds crossed the signals. since under Pilot Rule 27, 33 U.S.C.A. § 292, there may be a departure from the rules in order to avoid immediate danger. Also, under Rule 28, 33 U.S.C.A. § 293, McKerchey's navigator failed and neglected to take such precautions to avoid this collision, as may be required by the ordinary practice of seamen, or by special circumstances of the case.

The rate of speed of the Olds—15 miles per hour—was not a contributing factor in the collision. When yet in positions of safety the two vessels were laterally 200

feet from one another and would have passed each other safely but for the faulty navigation of the McKerchey within less than one minute before the impact.

Captain Murray of the Olds had exercised his best judgment and skill as an experienced master, checked his vessel to bare steerageway within the time of less than a minute before the collision; he was confronted with a sudden emergency, not of his making, and to have reversed his engines while within a few feet from the docks on the Canadian side was fraught with the danger of his stern coming in contact with the dock or the ferry boat moored there, and under these conditions he could not have been guilty of any fault in the navigation of his vessel as contributing to the collision.

Mate Holladay of the McKerchey was guilty of negligence in violation of statutory duties imposed on him. The violation of these duties by him was the proximate cause of the collision.

There was no risk of collision between the Olds and the McKerchey until the McKerchey's sheer when the vessels were from 300 to 400 feet from one another. The navigable channel was not less than 1600 feet wide; the Olds' speed was not excessive under the circumstances existing just prior to the McKerchey's sheer and therefore the McKerchey must be held solely at fault and liable for all damages resulting from the collision.

Decree for libelant. Cross-libel dismissed.