**Petition of GREAT LAKES TOWING CO.**
**THE MASSACHUSETTS.**
**Civil Action No. 433.**

District Court, D. Minnesota, Fifth Division.
Aug. 20, 1948.

Leckie, McCreary, Schlitz & Hinslea, by Lucian Y. Ray and Theodore C. Robinson, all of Cleveland, Ohio, and W. O. Bissonett, of Duluth, Minn., for claimant.

McKeehan, Merrick, Arter & Stewart and George William Cottrell, by Carl A. Schipfer and W. Alexander Eldridge, all of Cleveland, Ohio, and Roger W. Spencer, of Duluth, Minn., for petitioners.

DONOVAN, District Judge.

Petitioners commenced this proceeding in admiralty to exonerate from or limit their liability, as provided by an Act of Congress, 46 U.S.C.A. § 183. It involves a marine accident which occurred while petitioners' Steam Tug Massachusetts was engaged in towing the Steamer Otto M. Reiss, owned and operated by The Reiss Steamship Company, the claimant herein.

Issues having been joined, counsel for the respective parties stipulated in open court that all questions pertaining to the value of the tug under the initial proceeding should be postponed pending trial and decision by the Court on the sole question of liability.

Briefly, the facts at trial disclose the Reiss to be a steel bulk freighter, 430 feet

overall length, with a beam of 52.2 feet, depth of 24 feet, and propelled by a triple expansion-type engine of 1800 horsepower. Built in 1906, it was of 4510 gross tons, and used to carry ore, coal and grain between ports on the Great Lakes. The Steam Tug Massachusetts has a keel length of 78.8 feet, beam of 20 feet, depth of 12 feet 6 inches, and a high pressure engine of 700 horse power. It was built in 1928, owned by the Great Lakes Towing Company, and operated by The Union Towing and Wrecking Company as demise charterer in and about the ports of Duluth, Minnesota, and Superior, Wisconsin.

Early in the afternoon of August 29, 1944, Captain Joseph P. LePage contacted the Union Company and ordered one tug to assist him in maneuvering the Reiss from the Great Northern Slip on the Wisconsin side of St. Louis Bay Channel of Lake Superior, whereat the Reiss was loading a 275,000-bushel cargo of wheat from the Great Northern Railway Company elevator. The slip is about 1,750 feet long and 150 feet wide, running almost due north and south, with the elevator on the east side and railroad freight houses on the west side. The Reiss, when loaded, was headed into the slip. Her port side was next to the elevator dock. Her stern was one to two boat-lengths from the outer and north end of the slip.

Responding to the order of Captain LePage the tug, commanded by Captain Swenson, approached and laid astern of the Reiss. LePage invited Swenson to board the steamer, following which the two captains walked to the steamer's pilot house. LePage delivered a requisition to Swenson and they discussed plans pertaining to signals and movements of the two vessels during the maneuvering necessary to back the steamer out of the slip, swinging the stern in the form of an arc upstream and the bow downstream, so that she would be headed for the drawbridge and Lake Superior.

With Captain LePage and a wheelsman in the pilot house, the first mate on the forecastle head, the second mate aft, the chief engineer in the engine room and the other members of the crew at their respective stations, the steamer's manila towline was passed and made fast to the stern towing bitts of the tug with a play of 50 to 75 feet between the two vessels. "All right" signals were exchanged and the steamer began the first movement at half speed astern. The weather was calm and clear. Visibility was good. From his post in the pilot house Captain LePage had an unobstructed view of his steamer and the tug.

The crew of the tug consisted of the captain, engineer, fireman and linesman. Captain Swenson was in the pilot house, the engineer at his post, and the fireman at times would assist the linesman. As the steamer moved herself stern first out of the slip, the tug swung around on the starboard quarter of the Reiss and started pulling her afterend upstream at an angle of about 45°. This angle was increased to 90°, and ordinarily would continue such increase of the angle until 180° was attained in the process of straightening out the steamer, until she was headed downstream and towards the southerly or Wisconsin draw of the Northern Pacific Railway Company bridge over the south channel. This maneuver was intended to point the steamer's stern toward the South Channel Ranges, and her bow in the direction of the course she planned to pursue towards said draw and destination.

LePage and Swenson were familiar with the slip and the plan contemplated from previous experience. It was clearly understood between them that when the bow of the Reiss came abreast of the second button from the open end of the slip the steamer was to retard movement astern by reversing her engine to full speed ahead. LePage said he did this. Swenson said he did not. LePage testified that he reversed the engine of the steamer at the agreed point and it was working full speed ahead on a hard left rudder, and that he had no thought of possible mishap until he received a "not clear" signal and saw the towline go over the stern of the tug. The tug sounded no danger signals. The steamer sounded none, nor did she let go her anchors. LePage attributes the difficulty to "the failure of the tug to swing our stern up and the fact that he [Swenson] lost the towline."

Swenson's version is that "on account of the sternway [of the steamer] * * * with her rudder the way she was, hard left, and coming astern, * * * [the steamer was] working against us all the time."

The members of the tug crew were called as witnesses, and testified to the effect that the tug was pulling hard upstream to no avail, for the steamer continued backing. Instead of the angle between steamer and tug increasing, it began to decrease, until the tug was broadside and pulling almost parallel to the Reiss. The steamer, instead of stopping and going forward, continued its sternway until the tug was overpowered, taking water and in danger of jackknifing. To avoid this, they let out some of the line and tried to place a bumper between the two vessels. While continuing their efforts to avoid capsizing, the towline went overboard.

With her stern headed toward Red Nun No. 4, the Reiss did not stop until she struck the bank, which gives rise to the damage here claimed.

Petitioners, denying liability, also contend that they are relieved from any claim of damages by virtue of paragraphs 3 and 17 of the tariff, which they assert is a valid and binding contract of private towage between The Reiss Steamship Company and The Union Towing and Wrecking Company. Section 3 limits claim for delay to $100 per calendar day. It is a minor part of the claim for damages by the Reiss. Reliance is chiefly placed on paragraph 17 which reads as follows:

"When a vessel is towed or pushed stern first by one tug at her bow, or stern, or is being winded by one tug at her bow, the service will be under the direction and control of the master of the vessel so assisted, and the tug will not be liable for any damage that may be sustained or caused by the vessel coming into contact with any other craft, dock or other object, or by stranding or touching bottom, unless the tug fails to follow orders received by the master of the tug from the master in charge of the vessel being served, and the master and crew of the tug shall be and shall be held to be the servants and agents of the vessel served. (It is recommended that in stern first and winding operations in those ports where more than one tug is stationed, the vessel order two tugs.)"

If paragraph 17 is valid and applicable, petitioners assert that ends the case, because it purports to exempt them from liability even for their own negligence, if such is found to exist.

Claimant contends the tariff is inapplicable to the facts of the present case, and insofar as it provides for exemption on the part of petitioners from the results of their own negligence, it is invalid. It further contends that the damage sustained was caused solely by the negligence of the crew of the tug.

(1) Has claimant carried its burden, proving by a fair preponderance of the evidence that the tug was guilty of negligence proximately causing the damage to the Reiss?

(2) Was the Reiss guilty of such negligence as to make claimant solely or equally at fault for the damage sustained?

(3) Is paragraph 17 of the tariff, relied on by petitioners, applicable to the facts of the instant case so as to relieve the tug from liability?

The testimony of key witnesses is so sharply in conflict that it becomes the problem of the trier of the facts to sift the evidence with a view to arriving at an accurate determination of cause in resolving the question of liability.

Analysis of the record establishes that the minds of the respective masters of the Reiss and the tug were in accord on all matters pertaining to a proper and safe maneuvering of steamer and tug, as contemplated by the parties, and that they carried out their mutual understanding up to the time the engines of the Reiss were to be reversed, as called for upon signals previously agreed to. Something happened in the course of events that followed which destroyed their coordination, as planned between them in the steamer's pilot house. Was the disaster due to a crossing of signals between the Reiss and the tug? Was there confusion of signals between the pilot house and engine room on the Reiss? Were the tug and those in charge of her

guilty of negligence in the manner of towing or lack of good seamanship, and, if so, was such negligence to any extent the proximate cause of the damage to the Reiss? If the record warrants an affirmative answer to the last question, does paragraph 17 of the tariff relieve the tug from liability from such negligent conduct in its performance of the towing?

The record suggests that the master of the Reiss perhaps relied too much on his opinion that the master of the tug "knew what he was doing" with a live steamer in tow. The power of the tug was less than half of that of the Reiss. The gross tonnage of the Reiss (with a cargo of 8,000 tons of wheat) was greatly in excess of that of the tug. These comparisons of power, size and weight, did not permit of such abandonment of caution on the part of Captain LePage as the record indicates in the maneuvering of the Reiss out of the slip with the tug laboring astern at an angle upstream. Captain LePage testified that the Reiss started to work full speed ahead when the stern of the Reiss was about at the outer end of the dock, and as the tug whistled "to go ahead" and as the second mate rang up "not clear". At this time LePage said he was a boat-length out in the channel, and he must have realized a disaster was imminent, for he said, "I tried to make up my mind whether to let go and anchor or not, * * * but I decided against that." He said he was watching the stern of the Reiss. If he was, he should have seen what was obvious, for the stern of his vessel must have at that time been approaching or crossing the danger line. From the superior position he occupied in the pilot house of the Reiss, LePage could see all principal movements of the steamer and tug, and when and where and to what extent the stern of the Reiss should be swinging to the starboard. If it was not swinging upstream as planned, then he should have sounded a danger signal to the tug and taken the matter in hand without the assistance of the tug, rather than wait until he found himself upon the horns of the dilemma that followed.

The more reasonable assumption is that testified to by Swenson, who stated that the Reiss did not stop or go ahead when signalled to, but on the contrary, continued its sternway movement until the tug was required to abandon the towline to avoid capsizing. In this respect Swenson is corroborated by a disinterested witness, one Joseph L. Klenow, who, at the time of the towing, was employed by the Northern Pacific Railway Company as an operator of the drawbridge, and who was watching the steamer and tug from the doorway of his place of work in the superstructure of the bridge. This witness said he had an unobstructed view of the slip, Reiss and tug during the maneuvering, and that the tug was working hard pulling upstream as the stern of the Reiss was moving by the center abutment of the bridge, and at the same time he observed the Reiss was working her engine astern, which stern movement he recognized "by the wash from the propeller as it worked forward toward the bow of the ship." I can see no reason for disbelieving this witness. I am of the opinion that some crossing of signals occurred on the Reiss, and when it should have stopped and gone forward it continued astern. Assuming the Reiss complied with everything agreed upon, was Captain LePage entirely relieved from sounding danger signals? With all the power of the steamer's triple engines opposing, why should it continue astern as it did, from the second last button of the dock, until it fetched up in the mudbank? I think the towline was lost in an earnest effort by the crew of the tug to maneuver it into such a position as to meet the emergency created by the steamer's continued movement astern. Danger signals, perhaps, should have been given by the tug, but what service to the steamer would such signals from the tug render, when Captain LePage was in the very best position to see what was happening to the vessel he commanded? Klenow described the continued movement of the steamer astern as he saw it from the open door of the operator's house above the drawbridge. This witness had nothing to gain in telling what he saw, except the satisfaction that accompanies the telling of what one believes to be the truth. He said the propeller of the Reiss was working astern. It seems to me that Klen-

ow's description of what he actually saw tips the scales so that the evidence preponderates in favor of the tug.

Claimant has the burden of proving that the tug's negligence was the cause of the disaster. It is my opinion that such burden has not been carried. The facts and evidence pertaining to causation, adduced by the opposing parties to this proceeding, are so inconsistent that the judgment must go against the claimant upon whom rests the burden of proof. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Fort Smith Gas Co. v. Cloud, 8 Cir., 75 F.2d 413, 97 A.L.R. 833, and cases cited therein; The Kunkle Bros., D.C., 211 F. 540; Buckeye S. S. Co. v. Union Towing & Wrecking Co., D.C., 68 F. Supp. 749.

Appreciating the greater ponderosity of the steamer working astern at a time and in a place where it was intended that she have her engine full speed ahead, what could the tug of so much less power and tonnage accomplish in a contest so unequal? Assuming the tug was at fault in its timing of power to be applied, can it be sensibly said on the record of the instant case that there was even sufficient fault on the part of the tug to warrant apportionment of damages? I think not. The fault on the part of the Reiss is, in my judgment, alone sufficient to account for the disaster here met with. The fault, if any, on the part of the tug did not contribute in any substantial manner to the cause of the accident to the Reiss. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Irving S. Olds v. The John M. McKerchey, D.C., 72 F.Supp. 256.

I have considered all the points made and ably briefed by learned counsel. The conclusion reached obviates the necessity of considering the validity or effect of the tariff referred to, as it relates to the present case.

Petitioners may submit findings of fact, conclusions of law, order for judgment and form of judgment, on appropriate notice.

Claimant may have an exception.