TRACY TOWING LINE, Inc. v. CITY OF
JERSEY CITY et al.

Petition of TRACY TOWING LINE, Inc.
The WILLIAM J. TRACY.
Nos. 408–51, 286–51.

United States District Court, D. New Jersey.
June 16, 1952.

John G. Flanigan, Jersey City, N. J., Macklin, Speer, Hanan & McKernan, Gerald J. McKernan and John C. Hart, New York City, for libellant.

John B. Graf, Atty. for City of Jersey City, Mortimer Neuman, Jacob J. Singer, Jersey City, N. J., for respondent, City of Jersey City.

Markley & Broadhurst, Jersey City, N. J., Charles W. Broadhurst, Jersey City, N. J., for Hudson Builders' Material Co.

MEANEY, District Judge.

Tracy Towing Line, Inc. brought this libel and petition seeking to recover damages from the respondents in the first instance, and seeking exoneration from or limitation of liability in the second. Of the two respondents, only the City of Jersey City is involved in both actions. Hudson Builders' Material Company is sought solely to respond in damages in the libel.

Since the question of liability must be determined in the libel and a failure to find liability would be dispositive of the limitation proceeding, the libel will be considered first.

For convenience libellant, Tracy Towing Line, Inc., will be referred to as Tracy, the tug "William J. Tracy" as the tug, respondent, City of Jersey City, as the City, and respondent, Hudson Builders' Material Company, as Hudson.

By stipulation entered into by the parties, the two causes were consolidated for trial.

### Findings of Fact.

1. Tracy was the bareboat charterer of the tug.

2. The City was and still is the owner of the six hundred foot wharf in the Hackensack River at the foot of Howell Street in Jersey City, New Jersey.

3. Hudson was the lessee of the northerly three hundred feet of the wharf.

4. The tug was regularly inspected and was in a seaworthy condition both before and after the sinking.

5. The tug arrived at the Howell Street wharf at about 4 o'clock on the morning of September 23, 1950.

6. She was moored port side to, to the wharf with her stern about ten feet from the beginning of that portion of the wharf which was leased by Hudson.

7. The following lines were in use: a stern line made fast to the cleat under the oil pipe line on the wharf, a strap line from the bow leading aft to the next cleat on the southerly three hundred feet of the wharf, and a line from the bow leading forward and affixed to a cleat.

8. Sufficient slack to allow for the rise and fall of the tide was placed on the lines at this time.

9. Following the mooring, the tug's captain and crew went ashore about 6:00 a. m. with the exception of one Borges, a fireman, who was left on board as a watchman.

10. About 10 o'clock on the morning of September 23rd, employees of Hudson requested permission from the watchman to move the tug further down the wharf in a direction away from that leased by said Hudson.

11. Permission to move the tug was not granted.

12. Subsequently Hudson's employees removed the tug's lines and with the aid of a truck moved her about forty or fifty feet. The mooring lines were then affixed to different cleats.

13. The watchman failed to notify his superiors of this happening.

14. At 6:00 p. m., and again at midnight, the watchman used the steam siphon to remove any excess water from the bilges.

15. Subsequent to the moving of the tug there was a low tide, a high, and again a low.

16. At about 3 o'clock on the morning of September 24th the watchman heard a noise and discovered that the tug was listing toward the port side.

17. The watchman tended the lines but could do nothing with the strap line as it was too tight.

18. He also went below to operate the pumps, but the water rising through the coal bunkers caused him to leave the ship.

19. When the tug's captain arrived on the wharf at noon on September 24th, he saw that the tug had sunk in the water next to the wharf. The stern line had parted but the bow line and the strap were holding.

20. After the tug was raised by salvors, external examination of the hull, while in drydock, revealed no specific source of leakage, and hull conditions were found to be satisfactory. At this time there was still coal in the bunkers.

21. There was no damage to the upper or lower guards on the port side.

22. The tug would not sink in twenty-four hours solely from the seepage at the packing gland.

23. The wharf was inspected periodically, was of standard construction and was maintained in good condition.

24. There was no indication of any damage to any of the horizontal courses which ran between the top of the wharf and the water.

### Discussion.

#### A. *The Libel*

■ Respondent City contends that the law of New Jersey governs the action. As authority for this proposition, the rule of Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, is advanced. It is sufficient to note that the Erie decision expressly excluded from its operation matters governed by the Federal Constitution or Acts of Congress. See Erie case, supra. In this proceeding Tracy has invoked the admiralty jurisdiction vested in the Federal Courts by Article 3, section 2, of the Constitution. Therefore the law of New Jersey is not controlling.

■ Generally the libellant has the burden of proving that some negligent act of the respondents was the proximate cause of the damage complained of. See Hams v. Luckenbach Terminals, D.C.D.N.J.1941, 38 F.Supp. 485. Since the City is sued as a wharfinger, and Hudson as one who undertook to shift the tug, the alleged negligence of each will be considered separately.

■ The City in its capacity as a wharfinger had a duty to exercise reasonable care in ascertaining the condition of the berths at its wharf and to remove dangerous obstructions, or give due notice of the existence thereof, to vessels about to use the berths. See Hams case, supra. Accordingly, unless libellant can show some dangerous condition of the wharf of which the City had knowledge, or should have had knowledge, there can be no recovery against the City. See M. & J. Tracy, Inc. v. Marks, Lissberger & Son, 2 Cir., 1922, 283 F. 100.

■■ Hudson is not sued as a wharfinger and will not be treated as such. As one assuming to shift and moor a vessel, its duty was to use reasonable and ordinary care to see that sufficient lines were used after the mooring and that said lines were properly and sufficiently affixed and adjusted. See Puget Sound Tug & Barge Co. v. Olympic Forest Prod. Co., D.C.W.D. Wash.N.D.1937, 21 F.Supp. 940. It is admitted that the tug was shifted by Hudson's employees and in the process of shifting the lines were newly affixed and adjusted by the employees of Hudson. Thus if liability is to be imposed upon Hudson, it must be shown that there was a failure to exercise requisite care in putting out the mooring lines. That Hudson was negligent in this regard is evidenced by the fact that the tug's stern line was broken. See Crossan v. Wood, D.C.S.D. N.Y.1890, 44 F. 94.

■ At this point the status of the tug becomes important. The sinking of a vessel at its berth, which sinking is unexplained and unexpected, gives rise to presumptions of unseaworthiness and negli-

gence. See The Jamaica, D.C.W.D.N.Y. 1931, 51 F.2d 858. Both of these presumptions are rebuttable. See The Jamaica, same. The presumption of unseaworthiness has been rebutted by uncontradicted evidence, but the presumption of negligence, considered in the light of the watchman and his actions, presents a more serious problem.

In The President Madison, D.C.W.D. Wash.N.D.1935, 13 F.Supp. 692, 696, the Court enunciated the duty of a watchman. "It is the primary duty of a watchman to look, think, and act—look for apparent or threatened approaching danger, think how to avoid or meet it, and act to avoid or meet its effect."

In the instant case the watchman refused to give his permission to move the tug and protested against its being moved. Such action on the part of libellant's representative relieves libellant of negligence. See Lambert Transportation Co. v. Furness-Withy & Co., 2 Cir., 1926, 16 F.2d 121. Mere protests, however, do not seem to be sufficient to discharge the duty imposed upon watchmen. No notice of the moving was communicated to Tracy until the damage was virtually an accomplished fact, and this was done some fifteen hours after said moving. In addition there was no attempt to check or adjust the lines until the tug was actually sinking. This was likewise some fifteen hours after the moving. Such inaction indicates neither thought nor adequate act to recognize, meet or avoid threatened danger.

The Court is thus presented with a situation where both parties have been guilty of negligence. In admiralty libellant's negligence is not a bar to recovery. See The Seeandbee, 6 Cir., 1939, 102 F.2d 577. It can only be invoked for the purpose of mitigating damages. See The Seeandbee case, supra. And this is so even where the libellant is suing in admiralty upon a tort arising within the territorial waters of a state. See In re Pennsylvania Railroad Co., 2 Cir., 1931, 48 F.2d 559. The negligence of which each party was guilty, does not seem to the Court to be of equal degree. That exhibited by Hudson in its unauthorized movement of the tug for

its own convenience, overbalances the negligence of the watchman in not checking the lines as fastened by Hudson, and in failing to notify the home office.

B. *The Limitation*

This Court has jurisdiction of a proceeding to limit liability even where the tort is non-maritime in character. See Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903.

The limitation provisions are contained in 46 U.S.C.A. § 183. Since subsections (b) through (f) pertain to a class of vessels of which the tug was not a member, we are only concerned with subsection (a). Section 183(a) provides that a vessel owner may limit his liability for damages where the loss was occasioned without his privity or knowledge.

Petitioner is not an owner but a bareboat charterer. His right to maintain this proceeding is statutory. See 46 U.S. C.A. § 186.

The relief sought in this proceeding is, in the alternative, exoneration from or limitation of liability. Accordingly, the first question for determination is whether liability exists, for absent that element there would be nothing to limit. See Petition of Liverpool, Brazil & River Plate Steam Nav. Co., 2 Cir., 1932, 57 F.2d 176. It is incumbent upon the claimant to prove the existence of this element. See Petition of Great Lakes Towing Co., D.C.D.Minn. 1948, 79 F.Supp. 1; The Vera III, D.C.E. D.N.Y.1938, 24 F.Supp. 421.

In the instant case the claimant has failed to carry this burden. The evidence shows that the sinking was the result of the joint negligence of Tracy and Hudson. But there is no showing here that the sinking of the tug was the proximate cause of any damage to the wharf.

Conclusions of Law.

*As to Libel.*

1. The City was not guilty of any negligence.

2. The presumption of unseaworthiness has been rebutted.

3. Hudson was guilty of negligence in failing to properly affix the tug's mooring lines.

4. Libellant's watchman was guilty of negligence in that he failed to carry out his duties as a watchman.

5. The negligent acts of libellant and respondent Hudson combined to cause the sinking which resulted in the damage complained of.

6. Accordingly, damages will be apportioned ⅔ Hudson, ⅓ Tracy.

*As to Petition for Limitation.*

1. The petitioner is entitled to exoneration from liability.